# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-19-00475-CV

---

**Barret Arnold Espe, Appellant**

**v.**

**Lindy Catherine Castellaw, Appellee**

---

### FROM THE 345TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-17-001605, THE HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

In this appeal, arising from a suit affecting the parent-child relationship (SAPCR), Barret Arnold Espe (Father) challenges those portions of the trial court's final decree of divorce that grant Lindy Catherine Castellaw (Mother) the right to make certain decisions on behalf of the couple's child, L.O.E., including the exclusive right to designate the child's primary residence. Father also challenges the trial court's award of attorney's fees and expenses in favor of Mother. We will modify the trial court's decree to the extent it awards attorney's fees and expenses "as additional child support," and affirm the decree as modified.

## BACKGROUND

Mother and Father were married in May 2014, and L.O.E. was born three months later. After L.O.E.'s birth, the family lived in Pflugerville, and Mother stayed home to care for L.O.E. while Father worked outside the home.

In July 2016, Mother and Father separated, and Mother moved to San Antonio to live with her family. After attempting to reconcile with Father, Mother filed for divorce in March 2017. The next month, in April 2017, the trial court signed temporary orders that, in part, gave Father the exclusive right to designate L.O.E.'s primary residence within Travis County and required both Mother and Father to submit to psychological evaluations.

After the couple agreed to a division of property, a final hearing on the issue of custody was held in October 2018. At the hearing, the trial court heard evidence establishing that on the evening of October 31, 2017, Mother was struck by a car as she was crossing a street. As a result of the accident, Mother sustained a serious brain injury that required more than four months of in-patient rehabilitation. Much of the testimony at the final hearing concerned Mother's mental health, both before and after her separation from Father, and the impact of her brain injury on her ability to care for L.O.E. The witnesses included Mother; Father; Stephen A. Thorne, Ph.D., the psychologist who performed the court-ordered psychological evaluations; and Anita Robertson, Mother's therapist.

At the conclusion of the final hearing, the trial court signed a final decree of divorce, dividing the property in accordance with the couple's agreement and appointing Mother and Father as joint managing conservators. The decree named Mother as the managing conservator with the exclusive right to designate L.O.E.'s primary residence and also gave Mother the right, "after meaningful consultation" with Father, to make certain medical, psychological, and educational decisions for L.O.E. The trial court awarded Father access to L.O.E. pursuant to a standard possession order. The trial court later issued findings of fact and conclusions of law in which it determined, as to each conservatorship right awarded, that the award was in L.O.E.'s best interest. This appeal followed.

## STANDARD OF REVIEW

We review a trial court's decision on issues of conservatorship and possession of a child for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *Chacon v. Gribble*, No. 03-18-00737-CV, 2019 Tex. App. LEXIS 10286, at *2 (Tex. App.—Austin Nov. 27, 2019, no pet.) (mem. op.). A trial court abuses its discretion if it acts without reference to any guiding rules and principles such that the ruling is arbitrary or unreasonable. *Cire v. Cummings*, 134 S.W.3d 835, 838-39 (Tex. 2004); *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.).

In family law cases, the abuse-of-discretion standard overlaps with traditional sufficiency standards of review. *Zeifman v. Michels*, 212 S.W.3d 582, 588 (Tex. App.—Austin 2006, pet. denied); *Clemons v. Lynn*, No. 03-16-00360-CV, 2017 Tex. App. LEXIS 2371, at *3-4 (Tex. App.—Austin Mar. 22, 2017, no pet.) (mem. op.). Consequently, challenges to legal and factual sufficiency do not constitute independent grounds for asserting error but are relevant factors in determining whether the trial court abused its discretion. *Coburn*, 433 S.W.3d at 823; *In re Marriage of C.A.S. & D.P.S.*, 405 S.W.3d 373, 383 (Tex. App.—Dallas 2013, no pet.). In applying the standard, we engage in a two-pronged inquiry: (1) whether the trial court had sufficient information upon which to exercise its discretion, and (2) whether the trial court erred in its application of that discretion. *Zeifman*, 212 S.W.3d at 588.

To determine if the evidence is legally sufficient to support the trial court's exercise of discretion, we consider the evidence in the light most favorable to the trial court's findings if a reasonable factfinder could and disregard evidence to the contrary unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). When reviewing the evidence for factual sufficiency, we consider and weigh all the evidence

3

presented and will set aside the trial court's findings only if they are so contrary to the overwhelming weight of the evidence such that they are clearly wrong and unjust. *Id.* at 826. "[A]n abuse of discretion does not occur as long as some evidence of a substantive and probative character exists to support the trial court's decision." *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.).

## ANALYSIS

### *Conservatorship and Possession*

On appeal, Father raises five issues challenging those portions of the divorce decree giving Mother certain conservatorship rights to L.O.E., including the right to designate the child's primary residence. When the trial court appoints joint managing conservators, it must designate the conservator who has the exclusive right to determine the primary residence of the child. Tex. Fam. Code § 153.134. In determining which joint conservator should have this exclusive right, the best interest of the child is the court's primary consideration, as it is in determining all "issues of conservatorship and possession of and access to the child." *Id.* § 153.002.

Conservatorship determinations are intensely fact driven. *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002). As a result, trial courts generally have wide latitude in determining what is in a child's best interest, *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982), and may use a non-exhaustive list of factors to aid in that determination, *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). The factors include: (1) the child's desires; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs

4

available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *See id.* at 372.

In three issues on appeal, Father asserts that the trial court abused its discretion in naming Mother as the joint managing conservator with the exclusive right to designate L.O.E.'s primary residence; the right to consent to medical, dental, and surgical treatment; the right to consent to psychiatric and psychological treatment; and the right to make decisions concerning L.O.E.'s education. In his fourth and fifth issues on appeal, Father challenges the trial court's decision to award him access to the child pursuant to a standard possession order. In all five issues, Father contends that the evidence is insufficient to support the trial court's determination that the granting of these rights in favor of Mother is in L.O.E.'s best interest.

At the final hearing, the trial court heard testimony establishing that the couple met when Mother was a sophomore in high school and Father was a sophomore in college and that Mother was nineteen years old when L.O.E. was born. In his testimony, Father told the trial court that he believed he worked well with Mother as a co-parent but that he was better suited to be appointed the managing conservator with the right to make decisions for L.O.E. In support of his request, Father testified about instances of behavior by Mother that, in his view, demonstrate she is unfit to care for L.O.E. and to make decisions on L.O.E.'s behalf.

According to Father, during the marriage, Mother would send him text messages while he was at work in which she threatened to kill herself and L.O.E. if he did not call her or come home immediately. On one occasion, Mother sent a text telling Father he should come

5

home because she had left the house and L.O.E. was home alone. In addition, Father testified that Mother had intentionally cut herself with scissors "50 to 100 times" and that she had reported to him that she once drank bleach and that, on another occasion, she swallowed an excessive amount of over-the-counter ibuprofen. Father admitted, however, that he did not witness Mother drinking bleach or taking an excessive amount of ibuprofen; that, as far as he knew, she never went to the hospital for treatment as a result of her harming herself; and that Mother has not made any more threats to harm herself or L.O.E. since they separated.

The trial court also heard evidence establishing that Father was arrested for DWI in April 2017, just two days before the hearing on temporary orders. As a result of the arrest, Father was required to have an alcohol-monitoring device in his vehicle and to undergo an alcohol evaluation. When questioned by Mother's attorney about the arrest, Father admitted that he did not inform the trial court about the arrest at the temporary-orders hearing; that he never disclosed his arrest to Mother or to Mother's counsel, despite having received a request for production for criminal records; and that he had never mentioned his DWI arrest or produced the results of his court-ordered alcohol evaluation to Dr. Thorne.

In her testimony, Mother described Father as controlling during the marriage and told the trial court that they would argue weekly. Mother told the trial court that during their arguments she often tried to leave the house. She testified about one incident where she tried to leave the house during an argument, and Father followed her to the car, pulled her out of the car, and then dragged her back to the house by her arm. A neighbor who witnessed the event called Child Protective Services, although no further action was taken. In addition, Mother testified that since their separation, Father had enrolled L.O.E. in a daycare in Pflugerville, without

6

informing her, and that he is often unresponsive to her texts with questions about the child's school, extracurricular events, and doctor's visits.

Mother also testified about her past behavior and mental health issues, as described by Father in his testimony. Mother testified that in the past, she had used illegal drugs, such as marijuana and cocaine, and had abused alcohol but that she has not used any illegal drugs since April 2017 and that since her accident, she no longer drinks to excess. Mother also admitted to sending threatening texts to Father but explained to the court that she was never serious about hurting herself or her child and that she had never actually left L.O.E. at home alone. Mother testified that when she sent those threats to Father, she was isolated, without friends, and that she "thought that was the best way [she] could show what was going on inside." Mother also told the court that she had never actually tried to harm herself by drinking bleach or taking over-the-counter medication and that she only told Father she had done those things to get attention. Finally, Mother admitted to "cutting" herself in the past but also stated that she has not engaged in this "cutting" behavior since before the separation in July 2016.

Mother testified that after the death of a close friend, she began seeing a therapist, Anita Robertson, and that she now realizes that she had been suffering from depression for years. At the time of the final hearing, Mother had been seeing Ms. Robertson for therapy most weeks for a period of three years and was taking prescribed medication to treat her depression and anxiety. Ms. Robertson testified at the hearing and told the trial court that Mother is an active patient who has followed her recommendations and suggested coping strategies. The therapist explained that although she initially diagnosed Mother with borderline personality disorder—a disorder which she described as being a "fear of abandonment" and "wanting attention"— Mother currently does not meet the diagnostic criteria for borderline personality disorder.

7

According to Ms. Robertson, Mother has acknowledged her past and now "presents as somebody who has more capacity for controlling impulsiveness." In addition, Ms. Robertson explained, Mother has made "marked improvement" and now has "a positive outlook on life" and on her family relationships.

As to the accident in October 2017, Mother admitted that she had been drinking with friends that night in downtown San Marcos and that the last thing she remembers is walking up and down the sidewalk looking for an Uber. Mother was initially in an intensive care unit and then later moved to a rehabilitation center for patients with brain injuries, where she received speech therapy, physical therapy, and occupational therapy. Mother testified that, as a result of the accident, she still has issues with her short-term memory and attention, that she is currently unable to drive, and that she will soon begin treatment to help with her fine motor skills. Mother described herself after the accident as "happier being alone" and "more present than [she] was before" and told the court, "[I]t really makes you kind of appreciate more what's in your life." At the time of the final hearing, Mother was residing with her mother in San Antonio, where she and L.O.E. each have their own room, and working in her mother's business, making $2,000 per month.

The trial court also heard from Dr. Thorne, who testified about the results of his court-ordered psychological evaluations of Mother and Father, and his reports were admitted into evidence. Dr. Thorne explained that his evaluation of Mother revealed that she had been suffering from depression and anxiety for years and that, before her accident, she had coped with her depression and anxiety in unhealthy ways, including by using illegal drugs and drinking in excess. Since the accident, however, Mother has been working with her therapist and is now coping in a manner Dr. Thorne deemed "appropriate given what she gone through in the last

8

year or so." Dr. Thorne told the trial court that Mother has acknowledged her past misconduct, including her tendency to make threats and to commit self-harm, and he described this acknowledgement as an encouraging first step to overcoming her issues. Dr. Thorne explained, "I don't think we can predict anything with 100 percent certainty, but I'm more worried about her doing attention-seeking stuff and self-harm than I am about her harming her daughter," and that as long as "she doesn't return to the impulsivity or the substances, I think she can meet a child's basic needs," meaning that she can "take care of a child alone" and "meet that child's academic, social, medical, emotional needs, [and] provide a safe and hygienic environment for the child." In addition, Dr. Thorne reported that, based on his review of Mother's neurological-psychological evaluation, conducted while she was in rehabilitation, he believed that Mother was progressing in her brain-injury recovery and that he had not seen any "concrete data" to suggest that she had "trauma that would permanently impact parenting skills."

As to Father's psychological evaluation, Dr. Thorne testified that his testing revealed traits in Father consistent with an obsessive-compulsive personality disorder, meaning a need for structure and routine that can sometimes be inflexible. Dr. Thorne also explained that Father also had a "communication style" in which he "does not give much information or context" or "display much emotion" and that based on the written communications between Mother and Father that he had seen, Mother and Father were unable to engage in productive communication. Dr. Thorne recommended to Father that he undergo counseling to help him develop a communication style that would "help him with parenting and co-parenting and just relationships in general." Despite Dr. Thorne's recommendation, Father admitted that he had not gone to any counseling. As to Father's previously undisclosed DWI arrest, Dr. Thorne testified

that had he known about the arrest at the time of his evaluation, he would have had concerns about Father's propensity for alcohol abuse.

In sum, the trial court heard evidence from both parties about their ability to communicate, make joint decisions, and to care for L.O.E. and meet her social, medical, and educational needs. In evaluating whether the trial court abused its discretion, we are mindful that the trial court is best able "to observe the demeanor and personalities of the witnesses and [to] 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record." *Echols*, 85 S.W.3d 477. Accordingly, we defer to the trial court's credibility determinations and do not substitute our judgment for that of the court. *Clemmons*, 2017 Tex. App. LEXIS 2371, at *8 (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003)). In other words, the fact that we might decide the issue differently does not establish an abuse of discretion. *Zeifman*, 212 S.W.3d at 587. Having reviewed the evidence under the appropriate standards, we conclude that there is sufficient competent evidence to support the trial court's conclusion that it is in L.O.E.'s best interest to give Mother, as joint managing conservator with Father, the right to determine the child's primary residence as well as the right to make decisions, in consultation with Father, about medical treatment, psychological treatment, and education for L.O.E., as specified in the decree.

Similarly, we conclude that the evidence is sufficient to support the conclusion that Father should have access to L.O.E. under a standard possession order. Joint managing conservatorship does not require the award of equal or nearly equal periods of physical possession of and access to the child to each of the joint conservators, Tex. Fam. Code § 153.135, and the Family Code provides a rebuttable presumption that the standard possession order is in the

10

child's best interest, *see id.* § 153.252.  After reviewing the record, we cannot conclude that the presumption was overcome.

The trial court had legally and factually sufficient evidence on which to exercise its discretion and did not err in the application of that discretion.  *See Zeifman*, 212 S.W.3d at 587.  Accordingly, the trial court did not abuse its discretion in its awards of conservatorship and possession, and we overrule Father's first, second, third, fourth, and fifth issues on appeal.

### *Attorney's Fees*

In a sixth issue, Father contends that the trial court abused its discretion in awarding Mother $10,000 in attorney's fees and expenses, as "additional child support."

Section 106.002 of the Family Code, which applies generally to all SAPCRs, provides the trial court with general discretion to render judgment for reasonable attorney's fees and expenses to be paid directly to a party's attorney.  *See* Tex. Fam. Code § 106.002(a); *Tucker v. Thomas*, 419 S.W.3d 292, 296 (Tex. 2013).  A judgment for attorney's fees under Section 106.002 may be enforced by any means available for the enforcement of a judgment for debt.  Tex. Fam. Code § 106.002(b).  The statute does not, however, authorize the trial court to characterize attorney's fees as additional child support—which a trial court may enforce using its contempt powers under Chapter 157—in non-enforcement suits.  *Tucker*, 419 S.W.3d at 298.

Here, the divorce decree states, in relevant part, that "[t]he judgment for [$10,000], for which let execution issue, is awarded against [Father], and [Father] is ordered to pay *as additional child support*, ten thousand dollars ($10,000) in attorney's fees, expenses, cost and interest to [Mother's attorney] *as additional child support* within ninety (90) days." (Emphasis added.)  On appeal, Father does not argue that the award of attorney's fees is generally

11

improper or that the amount of fees awarded is unreasonable. Instead, Father argues that because it its undisputed that there were not any claims against him for delinquent child support in this case, the trial court "erred by characterizing the award of attorney's fees, expenses, costs, and interest as additional child support." Consequently, Father requests that we render judgment striking that portion of the decree characterizing the award "as additional child support." In response, Mother agrees that the Texas Supreme Court's decision in *Tucker v. Thomas* is controlling on this issue and concedes that trial court's characterization of the award "as additional child support" is in error.

We sustain Father's sixth issue on appeal and will modify the decree to correct the error. *See* Tex. R. App. P. 43.2(b) (allowing appellate court to modify trial court's judgment and affirm as modified). We modify those portions on page 29 of the final decree of divorce relating to attorney's fees to read as follows:

> THE COURT FINDS that [MOTHER] has incurred reasonable attorney's fees, expenses, and costs~~, which were necessary as support for [MOTHER] and the child subject of this suit~~.
>
> . . .
>
> The judgment, for which let execution issue, is awarded against [FATHER], and [FATHER] shall [be] ORDERED to pay ~~as additional child support,~~ ten thousand dollars ($10,000) in attorney's fees, expenses, costs and interest to [MOTHER] by and through her attorney . . . ~~as additional child support~~ within ninety (90) days of the signature of this order. [Mother's attorney] may enforce this judgment for fees, expenses, and costs by any means available for the enforcement of a judgment for debt.

## CONCLUSION

Having sustained Father's sixth issue on appeal, we modify the judgment, as described above, and affirm the trial court's final decree of divorce as modified.

_____

Chari L. Kelly, Justice

Before Justices Goodwin, Kelly, and Smith

Modified and, as Modified, Affirmed

Filed:   May 21, 2021